39 Cal.App.4th 996 (1995)
46 Cal. Rptr.2d 289
In re PAUL E., a Person Coming Under the Juvenile Court Law.
ORANGE COUNTY SOCIAL SERVICES AGENCY, Plaintiff and Respondent,
v.
SUSAN E. et al., Defendants and Appellants.
Docket No. G017932.
Court of Appeals of California, Fourth District, Division Three.
October 25, 1995.
*998 COUNSEL
John L. Dodd, Ann H. Qushair and Jane Winer, under appointments by the Court of Appeal, for Defendants and Appellants.
*999 Laurence M. Watson, Chief Assistant County Counsel, and Gene Axelrod, Deputy County Counsel, for Plaintiff and Respondent.
Harold F. LaFlamme and Linda M. O'Neil for Minor.
OPINION
SILLS, P.J. 

INTRODUCTION
In this case we hold the safeguards afforded parents by section 361 of the Welfare and Institutions Code apply just as much to supplemental petitions filed under section 387 of the same code as they do to initial petitions. We further hold that mere chronic messiness in housekeeping, absent unsanitary conditions or resulting illness or accident, is not the clear and convincing evidence of a substantial risk of harm to a child which may justify a child's removal from his or her parents under section 361.[1]

FACTS
Paul E. is a four-year-old child, possibly autistic, who is loved by both his parents, Stephen and Susan. His mother is willing to chase him around the house to keep him from hurting himself. Paul has never been abused, or neglected, and his parents enrolled him in a special school for his needs. Until his recent removal by social workers he lived with his mother, father and grandmother in the grandmother's home in Huntington Beach. Unfortunately, despite their love for Paul, housekeeping at the grandmother's house has been, to say the least, "substandard." In July 1994 conditions in the house were both dirty and unsanitary.
But Paul was not removed from the home when the juvenile court established dependency jurisdiction in September 1994. The parents were given a service plan and the court ordered a number of services be provided, including a psychological evaluation of the child.
Over the next seven months Paul's parents made improvements in their living conditions, but social workers remained concerned about their ability to function as parents. When social workers inspected the house in April 1995 they still found it to be messy and dirty, though the unsanitary conditions which existed in July 1994 had been remedied. Social workers *1000 also identified several specific hazards. They found a propeller protruding from a boat located outside the house, a lamp socket with a short, and a small child's plastic wading pool in the backyard filled with dirty water. Social workers gave Paul's parents 30 days to remedy these latter conditions, and it is undisputed the parents did so within 8 days. Even so, social workers returned eight days later to take Paul into custody. They determined that the parents' "lack of progress in recognizing the dirty condition of the house demonstrate[d] that they were limited by their own ability."
A supplemental petition was filed on April 19, 1995,[2] alleging the parents had failed to comply with their case plan. On May 19, the juvenile court sustained the supplemental petition and ordered Paul placed in a foster home. Both parents now appeal from the dispositional order removing their child.[3]

DISCUSSION
(1) The primary issue in this appeal is the standard for removal of a child from his or her parents on a supplemental petition. Such a situation presupposes the child was not removed when jurisdiction was initially established. Section 361, subdivision (b) provides that "[n]o dependent child shall be taken from the physical custody of his or her parents ... with whom the child resides at the time the petition was initiated unless the juvenile court finds clear and convincing evidence of ... a substantial danger to the physical health of the minor ... and there are no reasonable *1001 means by which the minor's physical health can be protected without removing the minor from the minors' parents' ... physical custody." (Italics added.) In its respondent's brief the social services agency contends "it is not unreasonable" to say that section 361 does not apply to supplemental petitions. We disagree.
Only a few years ago California's dependency system  a system which can lead to the permanent severing of a parent's ties to a child  was under attack because a crucial determination at one point in the process (whether a minor should be returned to a parent) could be made by the mere preponderance of evidence. (Cf. §§ 366.21, subd. (f), 366.22, subd. (a).) Counsel for parents complained that termination based in part on determinations made by the lower preponderance standard did not accord with due process as articulated by the United States Supreme Court in Santosky v. Kramer (1982) 455 U.S. 745 [71 L.Ed.2d 599, 102 S.Ct. 1388] (New York juvenile dependency scheme did not comport with due process where permanent neglect could be shown by fair preponderance of the evidence). In Cynthia D. v. Superior Court (1993) 5 Cal.4th 242 [19 Cal. Rptr.2d 698, 851 P.2d 1307], however, our Supreme Court rebuffed the attack, emphasizing the "significantly different" nature of California's dependency scheme. (Id. at p. 254.) And one of the most important differences between California's scheme and the one held deficient in Santosky was the standard for removal of a child from a home. Cynthia D. put it plainly: "Except for a temporary period, the grounds for initial removal of the child from parental custody have been established under a clear and convincing standard...." (Id. at p. 253.) Another court recently noted the same thing about Cynthia D.: "The fact that the child could not initially be removed from custody absent a finding supported by clear and convincing evidence is a linchpin of the [Cynthia D.] court's determination that the statutory scheme for terminating parental rights comported with due process requirements." (In re Marquis D. (1995) 38 Cal. App.4th 1813, 1829 [46 Cal. Rptr.2d 198].)
The consequences of removal within the juvenile dependency system, even pursuant to a supplemental petition, should not be minimized. (Cf. In re Marquis D., supra, 38 Cal. App.4th at p. 1824 [section 361.2 requirement to place custody of removed child with noncustodial parent unless detrimental to minor "requires a difficult decision; it does not serve the court or the system well to diminish its impact"].) Once a child is removed, termination of parental rights becomes a distinct possibility unless, at some point prior to the end of reunification services, the child is returned. If the position of the social services agency were correct, then parental rights could in some cases *1002 be terminated without the safeguards of section 361. That would be flatly contrary to the rationale in Cynthia D., which relied on the existence of those safeguards to hold that eventual termination does accord with due process. (Cf. In re Marquis D., supra, 38 Cal. App.4th at p. 1828 ["Central to the [Cynthia D.] court's analysis were the procedural safeguards built into the system...."].)
Dicta in In re John V. (1992) 5 Cal. App.4th 1201, 1211 [7 Cal. Rptr. 2d 629]  to the effect that "the appropriate disposition," once a court sustains a section 387 supplemental petition, "is to move the child from parental to out-of-home custody"  is not helpful in ascertaining the proper standard of proof to remove a child in the wake of a supplemental petition. In John V. the court was faced with whether a post-1989 supplemental petition meant a child adjudicated a dependent under pre-1989 juvenile dependency law should be on the pre- or post-1989 "procedural track." (5 Cal. App.4th at p. 1211.) The court determined that because a supplemental petition "does not result in a new adjudication of dependency," and the problems were still the same as they were when the child was initially judged a dependent, the child should stay on the pre-1989 track, with termination proceedings to be governed by Civil Code section 232. (See 5 Cal. App.4th at pp. 1210-1211.) The court never focused on whether a supplemental petition somehow reduced the standard of proof necessary to remove a child in the first instance. In context, the John V. court was simply noting that once a placement with the father failed, the mechanics existed to move the child from a parental to an out-of-home placement.
If anything, the import of John V. is that section 361 necessarily applies to removal under supplemental petitions. Since a supplemental petition is not a "new" adjudication of dependency, the same protections which govern the removal of a child from parental custody the first time around should remain in effect. Otherwise those protections could be circumvented by allowing the child to remain in the home under the initial petition and later filing a supplemental one.
Neither does In re Joel H. (1993) 19 Cal. App.4th 1185 [23 Cal. Rptr.2d 878] favor the agency's position. Joel H. never confronted the question of whether removal from a parent's home pursuant to a section 387 supplemental petition required compliance with section 361's clear and convincing standard. It simply held that evidence of spanking, holding up a child's arms when spanking, sending the child to bed without dinner, and using a "harsh tone" when correcting the child was "insufficient proof of actual harm or danger of harm" to the child to support a section 387 disposition order removing the child from a great-aunt's home into which he had been placed *1003 earlier. (See Joel H., supra, 19 Cal. App.4th at pp. 1199-1203 and particularly pp. 1202-1203.)
Indeed, as in John V., a close reading of the case undercuts the agency's position. In Joel H. the initial removal from the mother had occurred years earlier, and the court specifically contrasted the "more stringent provisions of section 361" for removal from a parent or guardian from the standard for removal from a relative with whom the child had already been placed after an initial removal from a custodial parent. (In re Joel H., supra, 19 Cal. App.4th at pp. 1201 & 1201, fn. 14.) The clear implication of the court's language is that when removal of a child from a parent is contemplated, section 361's "more stringent" standards apply: "By contrast, if the court were considering a section 387 petition to remove a child from his or her parent's or guardian's custody, it would presumably have to proceed according to the more stringent provisions of section 361 which specify the circumstances under which the court may take a child from the physical custody of his or her parents or guardians." (In re Joel H., supra, 19 Cal. App.4th at p. 1201, fn. 14, original italics.)
We recognize removal of a child represents perhaps the biggest "stick" the social service agency can wield in getting recalcitrant (or, in the words of the agency's brief, "recidivist") parents to clean up their act  in this case, by literally cleaning up their house. (See In re Jeannette S. (1979) 94 Cal. App.3d 52, 60 [156 Cal. Rptr. 262] [suggesting that removal was an alternative if "stringent supervision" of mother did not result in "suitable home environment"].) We are not unsympathetic to the agency's concerns. When in doubt they must err on the side of a child's physical safety. Even so, removal of a child from his or her parents is a critical firebreak in California's juvenile dependency system. The Legislature has chosen to err, if at all, on the side of family preservation. The procedural safeguards of section 361 still apply to a removal pursuant to a supplemental petition.[4]
(2a) The question still remains whether the removal order here complied with section 361's standards. At the outset, we may eliminate the idea that *1004 the failure of the parents to comply completely with the service plan by itself justified removal. Section 361 by its terms operates independently of service plans. The test is whether there is clear and convincing evidence the child is in physical danger if left in the home (or already suffering severe emotional damage and there is no other way to protect the minor's emotional health without removal), not whether parents are obeying a service plan.[5]
Paul's mother Susan is described in the record as "slightly developmentally disabled," a phrase used euphemistically to denote mental retardation sufficient to qualify her for supplemental security income (SSI) disability payments. Paul's father, Stephen, has not been able to find work because of a criminal record. While the social services agency argues that Paul's autism is dispositive  that is, there is evidence his parents do not quite realize Paul's special needs and removal is necessary for his own protection  the factor is not enough, in the context of this case, to constitute clear and convincing evidence of either substantial danger to physical health, or that the minor is suffering severe emotional damage and there are no reasonable means of protecting the minor's emotional health without removal.
Autistic children have a hard time bonding with their own parents, much less caretakers.[6] In this regard, Judge Homer Thompson's remarks in the 1978 edition of the California Juvenile Court Deskbook, quoted with approval in Jeannette S., seem all the more apropos: "`Filthy home cases are sometimes those in which it is most difficult to remove the children, and often it could be the most damaging to the children to do so. Even though the home is a health hazard for the children, the mother is often a good, loving, and attentive mother in other respects. The children have responded to their mother's love and are very close to her. Removal of such children can be a shattering experience for them.'" (In re Jeannette S., supra, 94 Cal. App.3d at p. 61, quoting Thompson, Cal. Juvenile Court Deskbook (2d ed. Cont.Ed.Bar 1978) p. 184, Jeannette S. court's italics.)
*1005 This case fits the profile outlined by Judge Thompson. Susan is devoted to her son. Even though she has been perhaps a little slow to grasp the need to systematically "child-proof" her home, she is also willing to follow her son around all day to keep him from hurting himself.
(3) The Legislature has imposed limits on the ability of government to remove children from parents' homes under the aegis of child protection. "Section 361 embodies legislative solicitude for parental rights." (In re James T. (1987) 190 Cal. App.3d 58, 66 [235 Cal. Rptr. 127].) The statute "was part of an effort to shift the emphasis of the child dependency laws to maintaining children in their natural parents' homes where it was safe to do so, and to clarify the conditions in which a minor could be removed from his or her parents' custody." (In re Jason L. (1990) 222 Cal. App.3d 1206, 1216 [272 Cal. Rptr. 316].)
(2b) County social service agencies cannot cast themselves in the role of a super-OSHA for families.[7] While we certainly hope conditions improve in Paul's household, chronic messiness by itself and apart from any unsanitary conditions or resulting illness or accident, is just not clear and convincing evidence of a substantial risk of harm. (Cf. In re Kristin W. (1990) 222 Cal. App.3d 234, 253 [271 Cal. Rptr. 629] [after removal of children in filthy home case, fact there was no evidence at a 12-month hearing as to whether father had complied with service plan requirement to have a suitable home for his children was not alone sufficient to support finding there was no substantial probability of return within 6 months].) In the present case we take special note that Paul has not actually suffered any ill effects from his environment.[8]
The specific hazards which the social service agency identified in April 1995 and which led to Paul's removal are trivial to the point of being pretextual. A shorted lamp socket could occur in the White House. Motor boats normally have propellers on them. Children's plastic wading pools do not come with filtration systems, and if they are filled with water for any amount of time the water is going to become dirty. Worse hazards than these may be found on practically every farm in America. If such conditions were sufficient for removal from the home, generations of Americans who grew *1006 up on farms and ranches would have spent their childhoods in foster care. The order removing Paul from his parents' custody is reversed.
Wallin, J., and Rylaarsdam, J., concurred.
NOTES
[1] All statutory references in this opinion are to the Welfare and Institutions Code.
[2] Supplemental petitions are authorized under section 387. Briefly, the statute provides that any "order changing or modifying a previous order by removing a minor from the physical custody of a parent ... shall be made only after noticed hearing upon a supplemental petition." (Italics added.)

Rule 1430(c) of the California Rules of Court provides that a supplemental petition shall be used when a social service agency "concludes that a previous disposition has not been effective in the rehabilitation or protection of a child ... declared a dependent under Section 300 and [the agency] seeks a more restrictive level of physical custody." The rule then specifies the "level[s]" of restrictive custody, "in ascending order." Those levels are: placement in the home of the person entitled to legal custody; placement in the home of a noncustodial parent; placement in the home of a relative or friend; placement in a foster home; commitment to a private institution; commitment to a county institution; and finally, commitment to the California Youth Authority.
[3] A dispositional order removing the child from the home is appealable as a judgment. (See In re Megan B. (1991) 235 Cal. App.3d 942, 950 [1 Cal. Rptr.2d 177].) Accordingly we reject the social service agency's contention that the appeal should be dismissed. In any event, given the meritoriousness of the parents' position (their child was taken from them without sufficient cause), we would treat the appeal as a petition for writ of mandate. (See U.S. Financial v. Sullivan (1974) 37 Cal. App.3d 5, 12 [112 Cal. Rptr. 18] ["... we think the circumstances of the case at bench compelling enough to indicate the propriety of a petition for writ of mandate in the first instance"]; 9 Witkin, Cal. Procedure (3d ed. 1985) Appeal, § 41, p. 65 ["virtually all" nonappealable orders are reviewable by extraordinary writ].)
[4] In re Jeannette S., supra, 94 Cal. App.3d 52, 60, held the evidence insufficient to sustain a dispositional order removing a child from her mother in a "filthy home" case because alternatives were available. Specifically, the court said social workers could have placed the child in the home under "stringent conditions of supervision" with a warning that removal would follow if the mother "failed to keep Jeannette in clean clothes and to properly care for her." The appellate court also pointed out the juvenile court could have conditioned the child's in-home placement on the removal of the three dogs and two cats (uncleaned-up animal feces was a major problem in the household).

Even though the Jeannette S. court did not deal with a supplemental petition under section 387, the court's rationale does suggest that continued failure to "properly care" for a child after "stringent conditions of supervision" have been in place may indeed provide a basis for removal under section 361. We have no quarrel with Jeannette S. in that regard, as long as it is understood that the failure to "properly care" for a child means, in the peculiar circumstances of a given case, that one of the categories of subdivision (b) of section 361 still applies. Fidelity to the statute demands no less.
[5] The initial removal of a child from a parent's home, even where a service plan has been in existence for some time, must be distinguished from the return of the child to that home after a finding under section 361. In no less than three places in California's dependency scheme, the Legislature has declared, "The failure of the parent or guardian to participate regularly in any court-ordered treatment programs shall constitute prima facie evidence that return would be detrimental." (§§ 366.2, subd. (e); 366.21, subd. (f); and 366.22, subd. (a).) Obviously, "court ordered treatment programs" include drug rehabilitation. Whether this language should be read to include all the points of a service plan is not before us, and we express no opinion on the matter. This is an initial removal case, not a return case.
[6] See the description of autism in Kate's School v. Department of Health (1979) 94 Cal. App.3d 606, 610-611, footnote 6 [156 Cal. Rptr. 529]: "Their symptoms usually include a lack of responsiveness to social stimuli; that is, they don't seem to know or care about other people, often don't know who their parents are...."
[7] OSHA stands for the Occupational Safety and Health Administration, a federal government agency which promulgates regulations for safety in the workplace.
[8] The absence of ill effects is a way of distinguishing a loving-but-dirty-home case from a case of real neglect. (Cf. In re Susan M. (1975) 53 Cal. App.3d 300, 306 [125 Cal. Rptr. 707] [baby in filthy home was "severely anemic, somewhat cyanotic and inflicted with bronchiolitis," also "malnourished, tremendously dehydrated and had a severe and dangerous diaper rash"].)